UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

DONALD BOWDEN,                    :
        Plaintiff,               :
                                  :
        v.                        :     CA 11-84 DLM
                                  :
MICHAEL J. ASTRUE, Commissioner, :
Social Security Administration,  :
        Defendant.               :

## MEMORANDUM AND ORDER

This matter is before the Court on a request for judicial review of the decision of the Commissioner of Social Security (the "Commissioner"), denying disability insurance benefits ("DIB") under § 205(g) of the Social Security Act, as amended, 42 U.S.C. § 405(g) (the "Act").  Plaintiff Donald Bowden ("Plaintiff," the "claimant," or the "client") has filed a motion for an order reversing the decision of the Commissioner.  Defendant Michael J. Astrue ("Defendant") has moved for an order affirming the Commissioner's decision.

With the parties' consent, this case has been referred to a magistrate judge for all further proceedings and the entry of judgment in accordance with 28 U.S.C. § 636(c).  For the reasons set forth herein, I find that the Commissioner's decision that Plaintiff is not disabled is supported by substantial evidence in the record and is legally correct.  Accordingly, based on the following analysis, I order that Defendant's Motion for an Order Affirming the Decision of the Commissioner (Docket ("Dkt.") #13)

("Motion to Affirm") be granted and that Plaintiff's Motion for an Order Reversing the Decision of the Commissioner (Dkt. #10) ("Motion to Reverse") be denied.

### Facts and Travel

Plaintiff was born in 1964 and was forty-two years old as of the alleged onset date of his disability. (Record ("R.") at 13, 23)  He has a tenth grade education, is able to communicate in English, and has past relevant work experience as a cook in several nursing homes. (R. at 13, 24, 34, 139-41, 146)

Plaintiff protectively filed an application for DIB on July 31, 2008, (R. at 7, 92-94, 135), alleging disability beginning on August 7, 2006, due to depression, attention deficit disorder ("ADD"), and memory problems, (R. at 7, 140).  The application was denied initially, (R. at 7, 38, 42-44), and on reconsideration, (R. at 7, 39, 47-49).  Plaintiff then requested a hearing before an administrative law judge ("ALJ").  (R. at 7, 52)  A hearing was held on August 25, 2010, at which Plaintiff, represented by counsel, appeared and testified, as did an impartial vocational expert ("VE").  (R. at 7, 20-37)

On September 24, 2010, the ALJ issued a decision finding that Plaintiff was not disabled within the meaning of the Act.  (R. at 7-15)  The Decision Review Board selected Plaintiff's claim for review, (R. at 1, 4), but failed to complete its review within the time allowed, (R. at 1), thereby rendering the ALJ's decision the

final decision of the Commissioner, (id.).  Thereafter, Plaintiff filed this action for judicial review.

### Issue

The issue for determination is whether the decision of the Commissioner that Plaintiff is not disabled within the meaning of the Act, as amended, is supported by substantial evidence in the record and is free of legal error.

### Standard of Review

Pursuant to the statute governing review, the Court is empowered "to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g).  The Court's role in reviewing the Commissioner's decision is limited.  Brown v. Apfel, 71 F.Supp.2d 28, 30 (D.R.I. 1999).  Although questions of law are reviewed *de novo*, the Commissioner's findings of fact, if supported by substantial evidence in the record,[1] are conclusive.  Id. (citing 42 U.S.C. § 405(g)).  The determination of substantiality is based upon an evaluation of the record as a whole.  Id. (citing Irlanda Ortiz v. Sec'y of Health & Human

_____

[1] The Supreme Court has defined substantial evidence as "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S. 389, 401, 91 S.Ct. 1420 (1971)(quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229, 59 S.Ct. 206 (1938)); see also Brown v. Apfel, 71 F.Supp.2d 28, 30 (D.R.I. 1999)(quoting Richardson v. Perales, 402 U.S. at 401).

Servs., 955 F.2d 765, 769 (1st Cir. 1991)("We must uphold the
[Commissioner's] findings ... if a reasonable mind, reviewing the
evidence in the record as a whole, could accept it as adequate to
support his conclusion.")(second alteration in original)).  The
Court does not reinterpret the evidence or otherwise substitute its
own judgment for that of the Commissioner.  Id. at 30-31 (citing
Colon v. Sec'y of Health & Human Servs., 877 F.2d 148, 153 (1st Cir.
1989)).  "Indeed, the resolution of conflicts in the evidence is
for the Commissioner, not the courts." Id. at 31 (citing Rodriguez
v. Sec'y of Health & Human Servs., 647 F.2d 218, 222 (1st Cir. 1981)
(citing Richardson v. Perales, 402 U.S. 389, 399, 91 S.Ct. 1420
(1971))).

### Law

To qualify for DIB, a claimant must meet certain insured
status requirements,[2] be younger than 65 years of age, file an
application for benefits, and be under a disability as defined by
the Act.  See 42 U.S.C. § 423(a).  The Act defines disability as
the "inability to engage in any substantial gainful activity by
reason of any medically determinable physical or mental impairment
which can be expected to result in death or which has lasted or can
be expected to last for a continuous period of not less than 12
months ...." 42 U.S.C. 423(d)(1)(A).  A claimant's impairment must

---

[2] The Administrative Law Judge ("ALJ") found that Plaintiff met the
insured status requirements of the Social Security Act (the "Act")
through December 31, 2011.  (R. at 7-8, 9)

be of such severity that he is unable to perform his previous work or any other kind of substantial gainful employment which exists in the national economy.  See 42 U.S.C. § 423(d)(2)(A).  "An impairment or combination of impairments is not severe if it does not significantly limit [a claimant's] physical or mental ability to do basic work activities."[3]  20 C.F.R. § 404.1521(a) (2011).  A claimant's complaints alone cannot provide a basis for entitlement when they are not supported by medical evidence.  See Avery v. Sec'y of Health & Human Servs., 797 F.2d 19, 20-21 (1st Cir. 1986); 20 C.F.R. § 404.1529(a) (2011).

The Social Security regulations prescribe a five step inquiry for use in determining whether a claimant is disabled.  See 20 C.F.R. § 404.1520(a) (2011); see also Bowen v. Yuckert, 482 U.S. 137, 140-42, 107 S.Ct. 2287, 2291 (1987); Seavey v. Barnhart, 276 F.3d 1, 5 (1st Cir. 2001).  Pursuant to that scheme, the Commissioner must determine sequentially: (1) whether the claimant

---

[3] The regulations describe "basic work activities" as "the abilities and aptitudes necessary to do most jobs."  20 C.F.R. § 404.1521(b) (2011).  Examples of these include:

> (1)  Physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling;
> (2)  Capacities for seeing, hearing, and speaking;
> (3)  Understanding, carrying out, and remembering simple instructions;
> (4)  Use of judgment;
> (5)  Responding appropriately to supervision, co-workers and usual work situations; and
> (6)  Dealing with changes in a routine work setting.

Id.

is presently engaged in substantial gainful work activity; (2) whether he has a severe impairment; (3) whether his impairment meets or equals one of the Commissioner's listed impairments; (4) whether he is able to perform his past relevant work; and (5) whether he remains capable of performing any work within the economy. See 20 C.F.R. § 404.1520(b)-(g). The evaluation may be terminated at any step. See Seavey, 276 F.3d at 4. "The applicant has the burden of production and proof at the first four steps of the process. If the applicant has met his or her burden at the first four steps, the Commissioner then has the burden at Step 5 of coming forward with evidence of specific jobs in the national economy that the applicant can still perform." Freeman v. Barnhart, 274 F.3d 606, 608 (1st Cir. 2001).

**ALJ's Decision**

Following the familiar sequential analysis, the ALJ in the instant case made the following findings: that Plaintiff had not engaged in substantial gainful activity since August 7, 2006, his alleged onset date, (R. at 9); that Plaintiff's ADD, depression, and substance addiction disorder were severe impairments, (id.); that Plaintiff did not have an impairment or combination of impairments which met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1, (R. at 10); that Plaintiff retained the residual functional capacity ("RFC") to perform a full range of work at all exertional levels

6

but with the nonexertional limitations of a moderate limitation in concentration requiring only simple, routine, repetitive tasks with only simple work decisions and few, if any, workplace changes without fast paced production requirements and a moderate limitation in social functioning requiring isolation from others with only up to occasional supervision, (R. at 11); that Plaintiff's medically determinable impairments could reasonably be expected to cause his alleged symptoms, but his statements concerning the intensity, persistence, and limiting effects of these symptoms were not credible to the extent they were inconsistent with the above RFC, (R. at 12); that Plaintiff was not capable of performing any past relevant work, (R. at 13); that, considering Plaintiff's age, education, work experience, and RFC, there were jobs existing in significant numbers in the national economy which Plaintiff could perform, (R. at 14); and that Plaintiff was not under a disability, as defined in the Act, at any time through the date of the ALJ's decision, (id.).

## Errors Claimed

Plaintiff alleges that: 1) the ALJ's mental RFC findings were not supported by substantial evidence; and 2) the ALJ's credibility findings were not supported by substantial evidence.

## Discussion

### I.   The ALJ's mental RFC findings

As noted above, the ALJ found that Plaintiff retained the RFC

7

to perform a full range of work at all exertional levels but with a moderate limitation in concentration requiring only simple, routine, repetitive tasks with only simple work decisions and few, if any, workplace changes without fast paced production requirements and a moderate limitation in social functioning requiring isolation from others with only up to occasional supervision.  (R. at 11)  Plaintiff argues that the ALJ's mental RFC findings are not supported by substantial evidence because they "were not based on the opinions of any treating, examining or reviewing medical source who had reviewed the entirety of the medical record."  Plaintiff's Memorandum in Support of His Motion for an Order Reversing the Decision of the Commissioner ("Plaintiff's Mem.") at 8.

The ALJ stated that:

> As for the opinion evidence, the undersigned gives substantial weight to the conclusions of the State agency consultant[]s who noted that the claimant has only "moderate" mental limitations.  In fact, the claimant's own psychiatric clinicians at the Rhode Island Hospital Department of Psychiatry have predominantly noted GAF's between "58" and "65" consistent with only mild to moderate symptoms.[4]  Indeed, an attending psychiatrist

---

[4] The Global Assessment of Functioning ("GAF") "is a subjective determination based on a scale of 100 to 1 of 'the clinician's judgment of the individual's overall level of functioning.'"  Langley v. Barnhart, 373 F.3d 1116, 1123 n.3 (10th Cir. 2004)(quoting Diagnostic and Statistical Manual of Mental Disorders (Text Revision 4th ed. 2000) ("DSM-IV-TR") at 32).  The GAF "[c]onsider[s] psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness."  DSM-IV-TR at 34.  A GAF score between 51-60 indicates "**[m]oderate symptoms** (e.g., flat affect and circumstantial speech, occasional panic attacks) **OR moderate difficulty in social, occupational, or school functioning** (e.g., few friends, conflicts with peers or co-

noted as recently as August 2010 that with most
psychiatric patients, except for being psychotic,
"structure and returning to work as soon as possible are
beneficial" for these patients.  The undersigned gives
less probative weight to the other more disabling GAF's
of "20" to "50" (consistent with serious symptoms up to
being a danger to one['] self)[5] noted by the claimant's
other treating and examining psychiatric sources since
these assessments only represent temporary exacerbations
in symptoms which improved in short periods of time.
Although she noted that the claimant had "significant"
memory loss and "difficulty" completing tasks, this
treating therapist [Susan Benson, MS, LMFT[6]] did not
specify the severity of these mental limitations.

(R. at 13)(internal citations and footnote omitted).

Plaintiff contends that the Disability Determination Services

("DDS") nonexamining sources "had not had the benefit of reviewing

approximately 15 months of records," Plaintiff's Mem. at 9, which

records were "significant," id., as they included an additional

diagnosis of a personality disorder as well as a suicide attempt in

June of 2010, see id.; see also id. ("No medical source had

reviewed those later records or gave an opinion of the functional

---

workers)."  Id.  A GAF between 61-70 is indicative of "**[s]ome mild
symptoms** (e.g., depressed mood and mild insomnia) **OR some difficulty in
social, occupational, or school functioning** (e.g., occasional truancy,
or theft within the household) **but generally functioning pretty well, has
some meaningful interpersonal relationships**."  Id.

[5] A GAF score between 11-20 reflects "**[s]ome danger of hurting self
or others** (e.g., suicide attempts without clear expectation of death;
frequently violent; manic excitement) **OR occasionally fails to maintain
minimal personal hygiene** (e.g., smears feces) **OR gross impairment in
communication** (e.g., largely incoherent or mute).  DSM-IV-TR at 34.  A
GAF between 41-50 denotes "**[s]erious symptoms** (e.g., suicidal ideation,
severe obsessional rituals, frequent shoplifting) **OR any serious
impairment in social, occupational, or school functioning** (e.g., no
friends, unable to keep a job).  Id.

[6] Licensed Marriage and Family Therapist.

limitations reflected therein."). Therefore, according to Plaintiff:

> The ALJ essentially acted as his own medical expert: He interpreted the raw medical data in functional terms, he determined on his own that [Plaintiff]'s personality disorder did not constitute a severe impairment and caused no significant functional limitations, and determined on his own that the GAF ratings above 50 were reliable reflections of [Plaintiff]'s functioning while the ratings below 50 were not.

Plaintiff's Mem. at 9.

As the ALJ noted, "the opinions of nonexamining physicians are entitled to some weight under the regulations."[7]  (R. at 10 n.2) (internal citations omitted); see also (R. at 13 n.4)(same).  The Court of Appeals for the First Circuit has stated that:

> [T]he amount of weight that can properly be given the conclusions of non-testifying, non-examining physicians will vary with the circumstances, including the nature of the illness and the information provided the expert.  In some cases, written reports submitted by non-testifying, non-examining physicians cannot alone constitute substantial evidence, although this is not an ironclad rule.

Rose v. Shalala, 34 F.3d 13, 18 (1st Cir. 1994)(internal citations and quotation marks omitted); see also Berrios Lopez v. Sec'y of Health & Human Servs., 951 F.2d 427, 431 (1st Cir. 1991); Social

---

[7] The ALJ acknowledged that "[g]enerally, we give more weight to opinions of treating sources, even 'controlling weight,' if they are well supported by medially acceptable clinical and laboratory diagnostic techniques and not inconsistent with other substantial evidence."  (R. at 13)

Security Ruling ("SSR") 96-6p, 1996 WL 374180, at *2-3 (S.S.A.).[8] Although an ALJ, as a layperson, is "not qualified to interpret raw medical data in functional terms ...," <u>Nguyen v. Chater</u>, 172 F.3d 31, 35 (1st Cir. 1999), "[t]his principle does not mean ... that the [ALJ] is precluded from rendering common-sense judgments about functional capacity based on medical findings, as long as [he] does not overstep the bounds of a layperson's competence and render a medical judgment," <u>Gordils v. Sec'y of Health & Human Servs.</u>, 921 F.2d 327, 329 (1st Cir. 1990).

The Psychiatric Review Technique ("PRT") form and Mental Residual Functional Capacity Assessment ("MRFC") completed by J. Coyle, Ph.D., and affirmed by Clifford Gordon, Ed.D., are the only formal functional assessments in the record.  (R. at 302-15, 316-19, 335)  As the ALJ noted, (R. at 13), they reflect that Plaintiff was no more than moderately limited in any area, (R. at 312, 316-17).  Dr. Coyle included a detailed summary of the medical evidence, (R. at 314), as well as the following Functional Capacity Assessment:

> Cl[aiman]t presents with probable ADD, depression, and alcohol abuse in remission.  His activities are reduced, and he reports his current psych meds are not helping.  His allegations are generally credible, but his limitations do not appear to exceed the moderate range of

---

[8] Social Security Ruling ("SSR") 96-6p provides in part that "[i]n appropriate circumstances, opinions from State agency medical and psychological consultants and other program physicians and psychologists may be entitled to greater weight than the opinions of treating or examining sources."  SSR 96-6p, 1996 WL 374180, at *3 (S.S.A.).

impairment in any critical area of functioning.
Intelligence measures in the high borderline to low
average range.  Cl[aiman]t has difficulty with complex
tasks of divided attention, but he retains the capacity
to understand, remember, and carry out routine and
repetitive tasks.

The evidence overall supports the following MRFC:

Cl[aiman]t can understand and remember 1 to 2 step
instructions of a routine nature.

He can sustain attn/conc[entration] for routine and
repetitive tasks and maintain effort for extended periods
of time over the course of a normal work day/week within
acceptable pace and persistence standards.

Social capacities are adequate for brief superficial or
casual interactions with the general public.  Cl[aiman]t
is capable of typical interactions with coworkers and
supervisors while completing routine tasks.[9]  He is able
to maintain adequate personal grooming and hygiene.

Stress tolerance is acceptable for a routine work
setting.  Cl[aiman]t can adapt to minor changes in
routine.  He is capable of independent goal directed
behavior while completing routine tasks.  He is aware of
typical hazards.  He can travel independently.

(R. at 318)

       In Berrios Lopez, the First Circuit found that substantial

evidence, in the form of reports of non-testifying, non-examining

physicians, supported the ALJ's RFC assessment.  See 951 F.2d at

431.  The court stated that:

       Although we think it a close question, we find, on the
       specific facts of this case, that there is substantial
       evidence to support the Secretary's finding.  Dr.
       Sanchez' report-if not Dr. Arzola's-contains more in the
       way of subsidiary medical findings to support his

_____

       [9] In fact, the ALJ's RFC is more restrictive in that the ALJ
"requir[ed] isolation from others with only up to occasional
supervision."  (R. at 11)

> conclusions concerning residual functional capacity than
> is customarily found in the reports of consulting, non-
> examining physicians.  Such reports often contain little
> more than brief conclusory statements or the mere
> checking of boxes denoting levels of residual functional
> capacity, and accordingly are entitled to relatively
> little weight.

Id.  Here, based on the foregoing, it is clear that Dr. Coyle did not simply make conclusory statements or check boxes.

As for Plaintiff's treating sources, his therapist, Susan Benson, submitted a report dated October 8, 2008, the substance of which reads in its entirety:

> HISTORY OF PRESENT ILLNESS:
> I have been meeting with [Plaintiff] almost on a weekly
> basis since 12/19/05.  He has significant symptoms of
> depression and PTSD brought about by a chaotic and
> abusive childhood. [Plaintiff] is also concerned because
> he appears to have significant memory loss, and he has
> difficulty completing tasks.  He has had to go back
> several times to make sure something has been done
> correctly.
>
> If you have any questions, please give me a call.  ...

(R. at 293)  Regarding this report, the ALJ stated that Ms. Benson "did not specify the severity of these mental limitations." (R. at 13)  There are no treatment notes from Ms. Benson in the record. Cynthia Yang, M.D., Plaintiff's most recent treating psychiatrist, declined to complete questionnaires, stating that "I have just begun seeing [Plaintiff] and feel unprepared to comment adequately. It will take me at least several visits to understand this patient fully enough to comment in this regard." (R. at 429)  Plaintiff's counsel was unable to obtain an opinion from Plaintiff's prior

13

treating psychiatrist, Brian Daly, M.D.  (R. at 190)  Thus, there are no functional assessments from Plaintiff's treating sources in the record.

Plaintiff cites <u>Alcantara v. Astrue</u>, 257 Fed. Appx. 333 (1st Cir. 2007), in support of his argument that because the state agency sources had not reviewed the entire record their opinions should not be considered substantial evidence in support of the ALJ's RFC findings.  Plaintiff's Mem. at 9.  <u>Alcantara</u>, however, is distinguishable.

First, the First Circuit in <u>Alcantara</u> stated that the ALJ could not give significant weight to the nonexamining consultant's opinion because it was "based on a significantly incomplete record, and it was not well justified."  <u>Alcantara</u>, 257 Fed. Appx. at 334. The court noted that the reviewing consultant had considered "no more than the first third of the record ...."  <u>Id.</u>  In the instant matter, Plaintiff alleges that the DDS reviewing sources had not reviewed "approximately 15 months of records."  Plaintiff's Mem. at 9.  Moreover, the <u>Alcantara</u> court observed that "[a]lthough the ALJ stated that the record underwent no material change, he did not explain his analysis.  The record repeatedly indicated that the appellant deteriorated with her parents' deaths."  <u>Alcantara</u>, 257 Fed. Appx. at 334.  In fact, the court  suggested that the ALJ was "unaware of the mother's death and the issue it raised."  <u>Id.</u> Here, by contrast, Dr. Coyle's opinion was well justified, and the

14

ALJ was clearly aware of subsequent events.  (R. at 13)(noting that
the "more disabling GAF's of '20' to '50'" indicated by Plaintiff's
treating and examining sources "only represent[ed] temporary
exacerbations in symptoms which improved in short periods of
time"); see also Discussion, Section I infra at 23-24.

Second, in Alcantara the First Circuit observed that:

> The ALJ ignored Therapist Serabian's opinion because she
> was a licensed social worker, not an acceptable medical
> source.  The ALJ could not simply ignore Serabian's
> opinion.  Although acceptable medical sources are the
> primary sources of evidence about the severity of
> impairment and its effect on work abilities, they are not
> the sole permissible sources of such evidence.  Serabian
> was a medical source capable of providing evidence about
> the severity and effects of impairment, as well as a
> general source of evidence.  The ALJ was required to
> weigh all of the evidence.

Alcantara, 257 Fed. Appx. 334-35 (internal citations omitted).
Unlike the ALJ in Alcantara, the ALJ here addressed the brief
report of Plaintiff's treating therapist, Susan Benson.  (R. at
13)("Although she noted that the claimant had 'significant' memory
loss and 'difficulty' completing tasks, this treating therapist did
not specify the severity of these mental limitations.")(internal
citation omitted).

Third, the Alcantara court stated that "[t]he ALJ also
discounted the appellant's limitations because she neglected
prescribed treatment."  Alcantara, 257 Fed. Appx. at 335.
Specifically, the plaintiff had missed therapy appointments, but
had obtained interim treatment during that time.  The court

15

reasoned that "the rationale for requiring compliance with medical advice is not to punish minor lapses, but to ensure that claimants do what they can to restore capacity." Id. In the instant matter, there is a pattern of lack of motivation and failure to follow recommendations.

For example, in a July 5, 2009, summary of treatment, Natalie Lester, M.D., observed that Plaintiff's depression had been characterized by, among other things, "amotivation ...." (R. at 411) Plaintiff had previously rejected inpatient hospitalization. (R. at 351) Dr. Lester observed that Plaintiff "remains focused on medication management to help him feel better, but making changes in his life (e.g. regarding marriage and job) may result in more improvement than medications can provide." (R. at 411)

Dr. Daly, who thereafter took over Plaintiff's care, indicated on July 27, 2009, after Plaintiff's second visit, that Plaintiff's "amotivation is concerning and bodes poorly for success in [cognitive behavioral therapy] as [Plaintiff] would likely not do [homework,] etc." (R. at 412) Dr. Daly mentioned Plaintiff's lack of motivation on subsequent occasions. (R. at 413)("I am beginning to feel that [Plaintiff] has little motivation to get better"); (R. at 416);(noting that Plaintiff "puts little effort into his care & getting better"). Dr. Daly also described Plaintiff as "help rejecting." (R. at 420, 421, 423, 424) Dr. Daly noted that Plaintiff "tended to be reluctant to try psychotherapy," (R. at

16

413), initially stating that he thought his former therapist would not want to work with him since he lost his insurance, (R. at 412), and subsequently declaring that he had tried therapy in the past and "it didn't help," (R. at 417).    In addition, Plaintiff "wouldn't do [Partial Hospitalization Program], would not do research study, does not want medication [change]," (R. at 418), all suggested by Dr. Daly.   On November 12, 2009, Dr. Daly recorded that Plaintiff "became angry when the conversation turned to his possibly working[,]" (R. at 417), despite Dr. Daly's explanation that most research revealed that "work & structure helped with depression," (id.); see also (R. at 418)(noting that Plaintiff "has low tolerance for being challenged around working (disability)"); (R. at 419)(noting that Plaintiff was not amenable "to suggestions that working might be  beneficial to him").   Dr. Daly concluded that "[f]rom all I can see though, including his past doing well while working [during the time he was drinking] & his current stagnation, disability is probably detrimental to him & he would likely do better working."   (Id.); see also (R. at 423) (noting that Plaintiff was "resistant to suggestions of activity & work/volunteering").   Dr. Daly summarized his year with Plaintiff, in part, as "significant for help rejecting as noted by Dr. Lester (previous provider) & amotivation to do anything to move his life forward ...." (R. at 427)   It was noted on June 30, 2010, by Rhode Island Hospital staff that Plaintiff was "awaiting disability which

17

may be affecting [his] desire to improve ...." (R. at 397)  Dr.
Yang, who assumed Plaintiff's care in July, 2010, recorded that
"[a]s per previous providers, [Plaintiff] appears quite help
rejecting ...." (R. at 425); see also (R. at 428).  Plaintiff
reiterated that he "wouldn't want to go [to therapy] anyway[,]" (R.
at 426), even if he had insurance.  It is noteworthy that after Dr.
Yang discontinued Plaintiff's Adderall, (R. at 425-26), he
continued to take it, (R. at 428).

As the First Circuit has stated, "[i]mplicit in a finding of
disability is a determination that existing treatment alternatives
would not restore a claimant's ability to work."  Irlanda Ortiz v.
Sec'y of Health & Human Servs., 955 F.2d 765, 770 (1st Cir. 1991)
(alteration in original)(quoting Tsarelka v. Sec'y of Health &
Human Servs., 842 F.2d 529, 534 (1st Cir. 1988)).  Plaintiff's
refusal to consider treatment alternatives and, with regard to his
continuing to take Adderall, outright disregard for his treating
psychiatrist's order, goes well beyond the "minor lapses,"
Alcantara, 257 Fed. Appx. at 335, noted by the court in Alcantara.

Plaintiff also argues that the diagnosis of Plaintiff's
"personality disorder, with symptoms of 'narcissism, provocative
statements, easily angered, poor inter personal relationships' was
made after the state agency psychologists made their review of the
record," Plaintiff's Mem. at 9 (quoting (R. at 422)), and that the
ALJ "determined on his own that [Plaintiff]'s personality disorder

18

did not constitute a severe impairment and caused no significant functional limitations," id. The first diagnosis of "pers[onality] d/o NOS," (R. at 424), appears in the record on May 10, 2010, (id.), although Dr. Daly had questioned whether there was an "Axis II component confounding his mood d/o ...," (R. at 409), from the beginning of his treatment of Plaintiff, (R. at 409-24, 427). The problem with Plaintiff's argument is that he has identified no functional limitations resulting therefrom. See Musto v. Halter, 135 F.Supp.2d 220, 233 (D. Mass. 2001)("Although the record is indeed peppered with references to [plaintiff]'s depression, there is absolutely no indication that it rises to the level of interfering with his inability to engage in any substantial gainful activity.")(internal quotation marks omitted). A diagnosis of a personality disorder, without more, does not equate to disability. See Torres v. Barnhart, 249 F.Supp.2d 83, 97 (D. Mass. 2003) ("[J]ust because [plaintiff] suffers from depression and anxiety simply does not mean, a fortiori, that she has any impairment or combination of impairments which significantly limits [her] physical or mental ability to do basic work activities.")(second alteration in original)(internal quotation marks omitted).

Plaintiff was questioned at the hearing regarding interpersonal relationships and anger issues:

Q    Do you have any difficulty dealing with people?

A    I don't know.

19

Q    Do you spend time with anyone besides your wife?

A    No.

Q    Why?

A    I just don't have the energy, the enthusiasm, just
     don't.

Q    Okay.

A    I just pretty much want to be by myself or with my
     four-legged, furry daughter in bed.

Q    At one point, your doctor mentioned you would get
     angry easily and poor interpersonal relationships.
     Would you say that that's true?

A    Yes.

Q    What, what will make you angry?

A    You'd have to ask my wife.  I -- you know --
     Somebody was to make fun of my four-legged, furry
     daughter, I'd -- I really don't pay attention to
     exactly what it is.

Q    What happens when you get angry?

A    Depends on whom I'm getting angry at.  If it's a --
     if it's a guy, I want to punch him.  If it's a
     girl, I might say something, but --

(R. at 28-39); see also (R. at 31)(noting that he would react to

stress in a fast-paced work environment by probably walking out or

getting angry).  To the extent Plaintiff's issues with anger and

interpersonal relationships can be considered functional

limitations resulting from Plaintiff's personality disorder, the

ALJ accounted for them in his RFC assessment.  He limited Plaintiff

to jobs without fast-paced production requirements.  (R. at 11)

The ALJ also restricted Plaintiff to jobs "requiring isolation from

20

others with only up to occasional supervision." (Id.)

Plaintiff makes a similar argument with regard to Plaintiff's June, 2010, suicide attempt, namely that the DDS psychologists did not see the records pertaining thereto. See Plaintiff's Mem. at 9 ("No medical source had reviewed those later records or gave an opinion of the functional limitations reflected therein."). Again, however, Plaintiff has failed to identify specific functional limitations allegedly reflected in these records.

Plaintiff was brought to Rhode Island Hospital by rescue on June 26, 2010, after taking a "couple swigs," (R. at 354, 386), of brake fluid and twelve clonezapam tablets, (id.), in what Dr. Yang described as a "suicidal gesture," (R. at 426).[10]   Plaintiff initially was assigned a GAF of 20, (R. at 386, 389), was subsequently hospitalized, (R. at 353-55, 425), and "[i]nsight oriented and supportive therapy [was] provided, with appropriate patient response," (R. at 355).   On discharge, his GAF was listed as 50, (id.), and the Rhode Island Hospital Discharge Summary stated:

> The patient denied suicidal or homicidal ideation and expressed hopefulness about the future.  He is future-focused and goal-oriented.  He denied auditory or visual hallucinations.  His judgment and insight are both considered to be fair.  Patient stated that he will call inpatient facility (S[S]TAR) and request admission in the event that he feels down again or has thoughts of suicide.  P[atien]t is stable, future-oriented, and there

---

[10] Plaintiff twice had attempted suicide "years ago in the context of alcohol intoxication via [overdose] and cutting."  (R. at 354)

is no evidence that he will try to hurt himself or others.

(R. at 355)

Dr. Yang saw Plaintiff on July 7, 2010, six days after his discharge.   (R. at 425)   Plaintiff related that prior to his overdose "he had missed taking his medication (Effexor) for several days [because] he had not received them in the mail."   (Id.) According to Plaintiff, he felt that his symptoms worsened without taking Effexor, "resulting in suicidal gesture ...."  (R. at 425-26)   According to Plaintiff, "[s]ince admission, [he] feels his mood, although depressed, is somewhat improved from restarting Effexor."   (R. at 426)   Plaintiff endorsed passive suicidal ideation, but did not have a plan, and reported that he was able to contract for safety at home.  (R. at 425)   On his next visit, Dr. Yang noted that Plaintiff appeared stable, presented no acute safety issues at that time, had no suicidal or homicidal ideation, and was future oriented.  (R. at 428)   Plaintiff described his mood as "alright."

The Court finds that the ALJ could reasonably have concluded that Plaintiff's suicide attempt/gesture represented a temporary exacerbation of symptoms which resolved in a short period of time, (R. at 13); see also Irlanda Ortiz, 955 F.2d at 769 (noting that a court must uphold the Commissioner's findings "if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support his conclusion"), especially given

22

Plaintiff's description of having been off his anti-depressant medication for several days prior to overdosing, (R. at 425-26). Further, Dr. Yang's expressed belief that, in general, she did not believe in disability for psychiatric reasons because "[f]or most psychiatric illnesses the majority of data shows that structure and returning to work as soon as possible are beneficial, and that lack of structure is deleterious to a patient's mental health and recovery," (R. at 429), is consistent with Dr. Daly's advice to Plaintiff, (R. at 417).

Finally, Plaintiff's contention that the ALJ "determined on his own that the GAF ratings above 50 were reliable reflections of [Plaintiff]'s functioning while the ratings below 50 were not," Plaintiff's Mem. at 9, and that "[h]e was not qualified to do any of that[,]" is unpersuasive. Plaintiff was assessed GAF ratings of 58 or above[11] on ten separate occasions. (R. at 321-28, 334, 343) He was assigned a GAF of 20[12] on arrival at the Rhode Island Hospital emergency room after his suicide attempt, (R. at 386, 389), a GAF of 25[13] during his stay, (R. at 388, 397), and a GAF of

---

[11] See n.4.

[12] See n.5.

[13] A GAF between 21-30 is described as follows: "**Behavior is considerably influenced by delusions or hallucinations OR serious impairment in communication or judgment** (e.g., sometimes incoherent, acts grossly inappropriately, suicidal preoccupation) **OR inability to function in almost all areas** (e.g., stays in bed all day, no job, home, or friends)." DSM-IV-TR at 34.

50[14] on discharge, (R. at 355, 400)  Dr. Fontaine also assessed a GAF of 50.[15]  (R. at 299)

While the Court would be concerned if the ALJ had extrapolated specific functional limitations from a certain GAF score, it was reasonable for the ALJ to conclude, simply based on the numbers, that the GAFs of 20, 25, and 50 "only represent[ed] temporary exacerbations in symptoms which improved in short periods of time." (R. at 13); see also Irlanda Ortiz, 955 F.2d at 769; Gordils, 921 F.2d at 329 (noting that ALJ is not precluded from making common-sense judgments).  Moreover, the sources assessing these GAF scores were not long term treating sources, and Dr. Fontaine examined Plaintiff only once.

Although a close question, the Court finds that, in the circumstances of this case, the ALJ was justified in relying on the assessments of the DDS reviewing sources.  Accordingly, Plaintiff's first claim of error is rejected.

## II.  The ALJ's credibility finding

The ALJ found that, although Plaintiff's medically determinable impairments could reasonably be expected to cause the symptoms alleged, his statements concerning the intensity, persistence, and limiting effects of those symptoms were

---

[14] See n.5.

[15] Dr. Fontaine also stated, however, that "[w]ith cognitive behavioral therapy, as well as medication, [Plaintiff's] prognosis should improve."  (R. at 299)

inconsistent with the ALJ's RFC determination.   (R. at 12)
Plaintiff contends that the ALJ's credibility findings are not
supported by substantial evidence.   Plaintiff's Mem. at 10.

An ALJ is required to investigate "all avenues presented that
relate to subjective complaints ...." Avery, 797 F.2d at 28.[16]   In
addition, "whenever the individual's statements about the
intensity, persistence, or functionally limiting effects of pain or
other symptoms are not substantiated by objective medical evidence,
the adjudicator must make a finding on the credibility of the
individual's statements based on a consideration of the entire case
record."   SSR 96-7p, 1996 WL 374186, at *2 (S.S.A.).

It is not sufficient for the adjudicator to make a
single, conclusory statement that "the individual's

---

[16] Specifically, the ALJ is directed to consider, in addition to the
objective medical evidence, the following factors:

1.   The individual's daily activities;
2.   The location, duration, frequency, and intensity of the
     individual's pain or other symptoms;
3.   Factors that precipitate and aggravate the symptoms;
4.   The type, dosage, effectiveness, and side effects of any
     medication the individual takes or has taken to
     alleviate pain or other symptoms;
5.   Treatment, other than medication, the individual
     receives or has received for relief of pain or other
     symptoms;
6.   Any measures other than treatment the individual uses or
     has used to relieve pain or other symptoms (e.g., lying
     flat on his or her back, standing for 15 to 20 minutes
     every hour, or sleeping on a board); and
7.   Any other factors concerning the individual's functional
     limitations and restrictions due to pain or other
     symptoms.

Avery, 797 F.2d at 29; see also 20 C.F.R. § 404.1529(c)(3) (2011)
(listing factors relevant to symptoms, such as pain, to be considered);
SSR 96-7p, 1996 WL 374186, at *3 (S.S.A.) (same).

25

> allegations have been considered" or that "the
> allegations are (or are not) credible." It is also not
> enough for the adjudicator simply to recite the factors
> that are described in the regulations for evaluating
> symptoms. The determination or decision must contain
> specific reasons for the finding on credibility,
> supported by the evidence in the case record, and must be
> sufficiently specific to make clear to the individual and
> to any subsequent reviewers the weight the adjudicator
> gave to the individual's statements and the reasons for
> that weight.

Id. The ALJ's credibility finding is generally entitled to deference, especially when supported by specific findings. See Frustaglia v. Sec'y of Health & Human Servs., 829 F.2d 192, 195 (1st Cir. 1987)(citing DaRosa v. Sec'y of Health & Human Servs., 803 F.2d 24, 26 (1st Cir. 1986)).

Here, the ALJ summarized Plaintiff's hearing testimony as follows:

> At the hearing, the claimant testified that he has been
> experiencing recurrent depression characterized by angry
> outbursts and being in a "dark place" where suicide is
> contemplated at least a "couple times a month." The
> claimant asserts being sober from alcohol for at least 4
> years though his depressive and attentional symptoms have
> worsened since then. The claimant is taking multiple
> psychiatric medications including Effexor. This
> medication causes tiredness as a side-effect. As to
> functional limitations, the claimant stated that he has
> focus/concentration problems and difficulty getting along
> with other people. He does continue to drive. In
> describing his daily activities, the claimant noted that
> he lives in a "RV" in his mother-in-law[']s driveway. He
> does not shower regularly and doesn't get dressed
> occasionally. Although his wife does most of the
> household chores, the claimant admits to sweeping floors
> and taking out the trash. He does enjoy "tinkering" with
> old scrap computers. The claimant takes 2 long (2-3
> hours each) naps during the day. He does not associate
> with anyone other than his wife. The claimant does go
> out to the park with his dog once or twice a month.

(R. at 11-12)  It is clear from the preceding passage that the ALJ contemplated the required factors.  See Avery 797 F.2d at 29.  He did not make a single, conclusory statement regarding consideration of Plaintiff's allegations or their credibility, nor did the ALJ simply recite the factors.  The ALJ noted Plaintiff's statements regarding his activities of daily living; the frequency and intensity of his depressive symptoms; the fact that he takes multiple psychotropic medications, including Effexor, and that tiredness is a side effect thereof; his functional limitations; and his lack of social activities.

In addition, at the hearing Plaintiff was asked about his recent suicide attempt and whether anything precipitated his suicidality:

> Q    When was the last time before that you felt suicidal?
>
> A    Apparently two weeks prior.
>
> Q    Does that just come over you or does something trigger it?
>
> A    Yes. No, sort of just -- My doctors asked you, you don't -- Can you remember what particularly happened?  Anything happened, when an episode happen -- No.

(R. at 32)  Accordingly, the Court finds that the ALJ considered the requisite criteria in evaluating Plaintiff's credibility.  See Avery, 797 F.2d at 29; 20 C.F.R. § 404.1529(c)(3); SSR 96-7p, 1996 WL 374186, at *3.

27

Plaintiff's main contention appears to be that the only specific reason the ALJ gave for disbelieving Plaintiff "was his having applied for unemployment compensation, which, according to the ALJ[,] 'indicated that he was "ready, able and willing to work" [and] is clearly inconsistent with these disabling allegations.'" Plaintiff's Mem. at 10-11 (quoting (R. at 13))(second alteration in original).   According to Plaintiff, "[t]here was no evidence before the ALJ that [Plaintiff] alleged he was able to work full time when he applied for unemployment, or that he believed he could hold a job for any significant length of time." Id. at 11.

Regarding this issue, the ALJ questioned Plaintiff as follows:

Q    Looked like you collected a little bit of unemployment last year too?

A    Yes.

Q    Is that still going on?

A    No.  That stopped --

Q    Okay.

A    -- awhile ago.

Q    You do recognize when you collect unemployment, you [are] certifying you're ready, willing and able to work?

A    I told that to my -- several of my doctors and they said, Well you really had no choice, you know.  I had no income and they --

Q    Okay. ...

(R. at 24-25)  The ALJ determined that "[i]n terms of his alleged severe symptoms and disabling limitations, the claimant's receipt

28

of 'unemployment compensation' during the alleged period of disability which indicated that he was 'ready, able and willing to work' is clearly inconsistent with these disabling allegations." (R. at 13)(internal citation omitted).  The Court finds that the ALJ could reasonably have reached this conclusion.  See Irlanda Ortiz, 955 F.2d at 769; see also Barrett v. Shalala, 38 F.3d 1019, 1024 (8th Cir. 1994)(noting that "in order to be eligible for unemployment benefits, [the plaintiff] was required to sign documents stating that he was capable of working and seeking work" and finding that "[t]his statement is clearly inconsistent with [his] claim of disability during the same period").

Plaintiff did not just *apply* for unemployment benefits, see Plaintiff's Mem. at 10, 11, by his own admission he *collected* benefits, (R. at 25).  In order to do so, he certified that he was ready, willing, and able to work.  (Id.)  Thus, contrary to Plaintiff's assertion, see Plaintiff's Mem. at 11, there was evidence before the ALJ, in the form of Plaintiff's testimony, from which the ALJ could reasonably have concluded that Plaintiff's statements were inconsistent.  Nor is it relevant what Plaintiff believed regarding his ability to work.  See id.  What *is* relevant is whether the ALJ had a reasonable basis for his credibility finding and whether he articulated that reason.  The Court answers these questions in the affirmative.

In addition, the ALJ noted, albeit in a different context,

29

that Plaintiff's "own psychiatric clinicians at the Rhode Island Hospital Department of Psychiatry have predominantly noted GAF's between '58' and '65' consistent with only mild to moderate symptoms."[17]   (R. at 13)(internal citations omitted).   While GAF scores are not determinative, see 65 FR 50746, 50764-65 (declining to endorse the use of the GAF scale in Social Security disability programs and stating that "[i]t does not have a direct correlation to the severity requirements in our mental disorders listings"), they are certainly something which an ALJ may consider in making a credibility finding, see Chanbunmy v. Astrue, 560 F.Supp.2d 371, 383 (E.D. Pa. 2008)(noting that GAF score "is intended to rate a patient's current general overall functioning, which is useful in tracking a patient's progress in global terms"); id. at 385 ("Courts have ... affirmed ALJs' decisions of nondisability in cases wherein claimants have GAFs in the range of 51-60.").

The Court concludes that the ALJ evaluated Plaintiff's credibility in accordance with the requirements and that the ALJ adequately stated his rationale for his credibility finding. Therefore, the Court also rejects Plaintiff's second claim of error.

## Summary

The Court finds that the ALJ's mental RFC findings are supported by substantial evidence in the record.   The Court further

---

[17] See n.4.

finds that the ALJ's credibility evaluation is supported by substantial evidence.

## Conclusion

The Court concludes that the ALJ's determination that Plaintiff is not disabled within the meaning of the Act is supported by substantial evidence in the record.  Accordingly, I order that Defendant's Motion to Affirm be granted.  I also order that Plaintiff's Motion to Remand be denied.


*/s/ David L. Martin*
DAVID L. MARTIN
United States Magistrate Judge
June 4, 2012