UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

DONALD BOWDEN,                    :
          Plaintiff,              :
                                  :
     v.                           :     CA 11-84 DLM
                                  :
MICHAEL J. ASTRUE, Commissioner,  :
Social Security Administration,   :
          Defendant.              :


**MEMORANDUM AND ORDER**

This matter is before the Court on a request for judicial
review of the decision of the Commissioner of Social Security (the
"Commissioner"), denying disability insurance benefits ("DIB")
under § 205(g) of the Social Security Act, as amended, 42 U.S.C. §
405(g) (the "Act").  Plaintiff Donald Bowden ("Plaintiff," the
"claimant," or the "client") has filed a motion for an order
reversing the decision of the Commissioner.  Defendant Michael J.
Astrue ("Defendant") has moved for an order affirming the
Commissioner's decision.

With the parties' consent, this case has been referred to a
magistrate judge for all further proceedings and the entry of
judgment in accordance with 28 U.S.C. § 636(c).  For the reasons
set forth herein, I find that the Commissioner's decision that
Plaintiff is not disabled is supported by substantial evidence in
the record and is legally correct.  Accordingly, based on the
following analysis, I order that Defendant's Motion for an Order
Affirming the Decision of the Commissioner (Docket ("Dkt.") #13)

("Motion to Affirm") be granted and that Plaintiff's Motion for an Order Reversing the Decision of the Commissioner (Dkt. #10) ("Motion to Reverse") be denied.

## Facts and Travel

Plaintiff was born in 1964 and was forty-two years old as of the alleged onset date of his disability. (Record ("R.") at 13, 23) He has a tenth grade education, is able to communicate in English, and has past relevant work experience as a cook in several nursing homes. (R. at 13, 24, 34, 139-41, 146)

Plaintiff protectively filed an application for DIB on July 31, 2008, (R. at 7, 92-94, 135), alleging disability beginning on August 7, 2006, due to depression, attention deficit disorder ("ADD"), and memory problems, (R. at 7, 140). The application was denied initially, (R. at 7, 38, 42-44), and on reconsideration, (R. at 7, 39, 47-49). Plaintiff then requested a hearing before an administrative law judge ("ALJ"). (R. at 7, 52) A hearing was held on August 25, 2010, at which Plaintiff, represented by counsel, appeared and testified, as did an impartial vocational expert ("VE"). (R. at 7, 20-37)

On September 24, 2010, the ALJ issued a decision finding that Plaintiff was not disabled within the meaning of the Act. (R. at 7-15) The Decision Review Board selected Plaintiff's claim for review, (R. at 1, 4), but failed to complete its review within the time allowed, (R. at 1), thereby rendering the ALJ's decision the

final decision of the Commissioner, (id.).  Thereafter, Plaintiff filed this action for judicial review.

## Issue

The issue for determination is whether the decision of the Commissioner that Plaintiff is not disabled within the meaning of the Act, as amended, is supported by substantial evidence in the record and is free of legal error.

## Standard of Review

Pursuant to the statute governing review, the Court is empowered "to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g).  The Court's role in reviewing the Commissioner's decision is limited.  Brown v. Apfel, 71 F.Supp.2d 28, 30 (D.R.I. 1999).  Although questions of law are reviewed *de novo*, the Commissioner's findings of fact, if supported by substantial evidence in the record,[1] are conclusive. Id. (citing 42 U.S.C. § 405(g)).  The determination of substantiality is based upon an evaluation of the record as a whole.  Id. (citing Irlanda Ortiz v. Sec'y of Health & Human

---

[1] The Supreme Court has defined substantial evidence as "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S. 389, 401, 91 S.Ct. 1420 (1971)(quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229, 59 S.Ct. 206 (1938)); see also Brown v. Apfel, 71 F.Supp.2d 28, 30 (D.R.I. 1999)(quoting Richardson v. Perales, 402 U.S. at 401).

<u>Servs.</u>, 955 F.2d 765, 769 (1st Cir. 1991)("We must uphold the [Commissioner's] findings ... if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support his conclusion.")(second alteration in original)). The Court does not reinterpret the evidence or otherwise substitute its own judgment for that of the Commissioner. <u>Id.</u> at 30-31 (citing <u>Colon v. Sec'y of Health & Human Servs.</u>, 877 F.2d 148, 153 (1st Cir. 1989)). "Indeed, the resolution of conflicts in the evidence is for the Commissioner, not the courts." <u>Id.</u> at 31 (citing <u>Rodriguez v. Sec'y of Health & Human Servs.</u>, 647 F.2d 218, 222 (1st Cir. 1981) (citing <u>Richardson v. Perales</u>, 402 U.S. 389, 399, 91 S.Ct. 1420 (1971))).

**Law**

To qualify for DIB, a claimant must meet certain insured status requirements,[2] be younger than 65 years of age, file an application for benefits, and be under a disability as defined by the Act. <u>See</u> 42 U.S.C. § 423(a). The Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months ...." 42 U.S.C. 423(d)(1)(A). A claimant's impairment must

_____

[2] The Administrative Law Judge ("ALJ") found that Plaintiff met the insured status requirements of the Social Security Act (the "Act") through December 31, 2011. (R. at 7-8, 9)

4

be of such severity that he is unable to perform his previous work or any other kind of substantial gainful employment which exists in the national economy. See 42 U.S.C. § 423(d)(2)(A). "An impairment or combination of impairments is not severe if it does not significantly limit [a claimant's] physical or mental ability to do basic work activities."[3] 20 C.F.R. § 404.1521(a) (2011). A claimant's complaints alone cannot provide a basis for entitlement when they are not supported by medical evidence. See Avery v. Sec'y of Health & Human Servs., 797 F.2d 19, 20-21 (1st Cir. 1986); 20 C.F.R. § 404.1529(a) (2011).

The Social Security regulations prescribe a five step inquiry for use in determining whether a claimant is disabled. See 20 C.F.R. § 404.1520(a) (2011); see also Bowen v. Yuckert, 482 U.S. 137, 140-42, 107 S.Ct. 2287, 2291 (1987); Seavey v. Barnhart, 276 F.3d 1, 5 (1st Cir. 2001). Pursuant to that scheme, the Commissioner must determine sequentially: (1) whether the claimant

---

[3] The regulations describe "basic work activities" as "the abilities and aptitudes necessary to do most jobs." 20 C.F.R. § 404.1521(b) (2011). Examples of these include:

(1) Physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling;
(2) Capacities for seeing, hearing, and speaking;
(3) Understanding, carrying out, and remembering simple instructions;
(4) Use of judgment;
(5) Responding appropriately to supervision, co-workers and usual work situations; and
(6) Dealing with changes in a routine work setting.

Id.

is presently engaged in substantial gainful work activity; (2) whether he has a severe impairment; (3) whether his impairment meets or equals one of the Commissioner's listed impairments; (4) whether he is able to perform his past relevant work; and (5) whether he remains capable of performing any work within the economy. See 20 C.F.R. § 404.1520(b)-(g). The evaluation may be terminated at any step. See Seavey, 276 F.3d at 4. "The applicant has the burden of production and proof at the first four steps of the process. If the applicant has met his or her burden at the first four steps, the Commissioner then has the burden at Step 5 of coming forward with evidence of specific jobs in the national economy that the applicant can still perform." Freeman v. Barnhart, 274 F.3d 606, 608 (1st Cir. 2001).

**ALJ's Decision**

Following the familiar sequential analysis, the ALJ in the instant case made the following findings: that Plaintiff had not engaged in substantial gainful activity since August 7, 2006, his alleged onset date, (R. at 9); that Plaintiff's ADD, depression, and substance addiction disorder were severe impairments, (id.); that Plaintiff did not have an impairment or combination of impairments which met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1, (R. at 10); that Plaintiff retained the residual functional capacity ("RFC") to perform a full range of work at all exertional levels

but with the nonexertional limitations of a moderate limitation in concentration requiring only simple, routine, repetitive tasks with only simple work decisions and few, if any, workplace changes without fast paced production requirements and a moderate limitation in social functioning requiring isolation from others with only up to occasional supervision, (R. at 11); that Plaintiff's medically determinable impairments could reasonably be expected to cause his alleged symptoms, but his statements concerning the intensity, persistence, and limiting effects of these symptoms were not credible to the extent they were inconsistent with the above RFC, (R. at 12); that Plaintiff was not capable of performing any past relevant work, (R. at 13); that, considering Plaintiff's age, education, work experience, and RFC, there were jobs existing in significant numbers in the national economy which Plaintiff could perform, (R. at 14); and that Plaintiff was not under a disability, as defined in the Act, at any time through the date of the ALJ's decision, (id.).

## Errors Claimed

Plaintiff alleges that: 1) the ALJ's mental RFC findings were not supported by substantial evidence; and 2) the ALJ's credibility findings were not supported by substantial evidence.

## Discussion

### I.   The ALJ's mental RFC findings

As noted above, the ALJ found that Plaintiff retained the RFC

to perform a full range of work at all exertional levels but with a moderate limitation in concentration requiring only simple, routine, repetitive tasks with only simple work decisions and few, if any, workplace changes without fast paced production requirements and a moderate limitation in social functioning requiring isolation from others with only up to occasional supervision. (R. at 11) Plaintiff argues that the ALJ's mental RFC findings are not supported by substantial evidence because they "were not based on the opinions of any treating, examining or reviewing medical source who had reviewed the entirety of the medical record." Plaintiff's Memorandum in Support of His Motion for an Order Reversing the Decision of the Commissioner ("Plaintiff's Mem.") at 8.

The ALJ stated that:

As for the opinion evidence, the undersigned gives substantial weight to the conclusions of the State agency consultant[]s who noted that the claimant has only "moderate" mental limitations. In fact, the claimant's own psychiatric clinicians at the Rhode Island Hospital Department of Psychiatry have predominantly noted GAF's between "58" and "65" consistent with only mild to moderate symptoms.[4] Indeed, an attending psychiatrist

---

[4] The Global Assessment of Functioning ("GAF") "is a subjective determination based on a scale of 100 to 1 of 'the clinician's judgment of the individual's overall level of functioning.'" Langley v. Barnhart, 373 F.3d 1116, 1123 n.3 (10th Cir. 2004)(quoting Diagnostic and Statistical Manual of Mental Disorders (Text Revision 4th ed. 2000) ("DSM-IV-TR") at 32). The GAF "[c]onsider[s] psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." DSM-IV-TR at 34. A GAF score between 51-60 indicates "**[m]oderate symptoms** (e.g., flat affect and circumstantial speech, occasional panic attacks) **OR moderate difficulty in social, occupational, or school functioning** (e.g., few friends, conflicts with peers or co-

noted as recently as August 2010 that with most psychiatric patients, except for being psychotic, "structure and returning to work as soon as possible are beneficial" for these patients. The undersigned gives less probative weight to the other more disabling GAF's of "20" to "50" (consistent with serious symptoms up to being a danger to one['¹]s self)[5] noted by the claimant's other treating and examining psychiatric sources since these assessments only represent temporary exacerbations in symptoms which improved in short periods of time. Although she noted that the claimant had "significant" memory loss and "difficulty" completing tasks, this treating therapist [Susan Benson, MS, LMFT[6]] did not specify the severity of these mental limitations.

(R. at 13)(internal citations and footnote omitted).

Plaintiff contends that the Disability Determination Services ("DDS") nonexamining sources "had not had the benefit of reviewing approximately 15 months of records," Plaintiff's Mem. at 9, which records were "significant," id., as they included an additional diagnosis of a personality disorder as well as a suicide attempt in June of 2010, see id.; see also id. ("No medical source had reviewed those later records or gave an opinion of the functional

_____

workers)." Id. A GAF between 61-70 is indicative of "**[s]ome mild symptoms** (e.g., depressed mood and mild insomnia) **OR some difficulty in social, occupational, or school functioning** (e.g., occasional truancy, or theft within the household) **but generally functioning pretty well, has some meaningful interpersonal relationships**." Id.

[5] A GAF score between 11-20 reflects "**[s]ome danger of hurting self or others** (e.g., suicide attempts without clear expectation of death; frequently violent; manic excitement) **OR occasionally fails to maintain minimal personal hygiene** (e.g., smears feces) **OR gross impairment in communication** (e.g., largely incoherent or mute). DSM-IV-TR at 34. A GAF between 41-50 denotes "**[s]erious symptoms** (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) **OR any serious impairment in social, occupational, or school functioning** (e.g., no friends, unable to keep a job). Id.

[6] Licensed Marriage and Family Therapist.

9

limitations reflected therein."). Therefore, according to Plaintiff:

> The ALJ essentially acted as his own medical expert: He interpreted the raw medical data in functional terms, he determined on his own that [Plaintiff]'s personality disorder did not constitute a severe impairment and caused no significant functional limitations, and determined on his own that the GAF ratings above 50 were reliable reflections of [Plaintiff]'s functioning while the ratings below 50 were not.

Plaintiff's Mem. at 9.

As the ALJ noted, "the opinions of nonexamining physicians are entitled to some weight under the regulations."[7] (R. at 10 n.2) (internal citations omitted); see also (R. at 13 n.4)(same). The Court of Appeals for the First Circuit has stated that:

> [T]he amount of weight that can properly be given the conclusions of non-testifying, non-examining physicians will vary with the circumstances, including the nature of the illness and the information provided the expert. In some cases, written reports submitted by non-testifying, non-examining physicians cannot alone constitute substantial evidence, although this is not an ironclad rule.

Rose v. Shalala, 34 F.3d 13, 18 (1st Cir. 1994)(internal citations and quotation marks omitted); see also Berrios Lopez v. Sec'y of Health & Human Servs., 951 F.2d 427, 431 (1st Cir. 1991); Social

---

[7] The ALJ acknowledged that "[g]enerally, we give more weight to opinions of treating sources, even 'controlling weight,' if they are well supported by medially acceptable clinical and laboratory diagnostic techniques and not inconsistent with other substantial evidence." (R. at 13)

Security Ruling ("SSR") 96-6p, 1996 WL 374180, at *2-3 (S.S.A.).[8]

Although an ALJ, as a layperson, is "not qualified to interpret raw medical data in functional terms ...," Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999), "[t]his principle does not mean ... that the [ALJ] is precluded from rendering common-sense judgments about functional capacity based on medical findings, as long as [he] does not overstep the bounds of a layperson's competence and render a medical judgment," Gordils v. Sec'y of Health & Human Servs., 921 F.2d 327, 329 (1st Cir. 1990).

The Psychiatric Review Technique ("PRT") form and Mental Residual Functional Capacity Assessment ("MRFC") completed by J. Coyle, Ph.D., and affirmed by Clifford Gordon, Ed.D., are the only formal functional assessments in the record. (R. at 302-15, 316-19, 335) As the ALJ noted, (R. at 13), they reflect that Plaintiff was no more than moderately limited in any area, (R. at 312, 316-17). Dr. Coyle included a detailed summary of the medical evidence, (R. at 314), as well as the following Functional Capacity Assessment:

> Cl[aiman]t presents with probable ADD, depression, and alcohol abuse in remission. His activities are reduced, and he reports his current psych meds are not helping. His allegations are generally credible, but his limitations do not appear to exceed the moderate range of

---

[8] Social Security Ruling ("SSR") 96-6p provides in part that "[i]n appropriate circumstances, opinions from State agency medical and psychological consultants and other program physicians and psychologists may be entitled to greater weight than the opinions of treating or examining sources." SSR 96-6p, 1996 WL 374180, at *3 (S.S.A.).

impairment in any critical area of functioning.
Intelligence measures in the high borderline to low
average range. Cl[aiman]t has difficulty with complex
tasks of divided attention, but he retains the capacity
to understand, remember, and carry out routine and
repetitive tasks.

The evidence overall supports the following MRFC:

Cl[aiman]t can understand and remember 1 to 2 step
instructions of a routine nature.

He can sustain attn/conc[entration] for routine and
repetitive tasks and maintain effort for extended periods
of time over the course of a normal work day/week within
acceptable pace and persistence standards.

Social capacities are adequate for brief superficial or
casual interactions with the general public. Cl[aiman]t
is capable of typical interactions with coworkers and
supervisors while completing routine tasks.[9] He is able
to maintain adequate personal grooming and hygiene.

Stress tolerance is acceptable for a routine work
setting. Cl[aiman]t can adapt to minor changes in
routine. He is capable of independent goal directed
behavior while completing routine tasks. He is aware of
typical hazards. He can travel independently.

(R. at 318)

In Berrios Lopez, the First Circuit found that substantial

evidence, in the form of reports of non-testifying, non-examining

physicians, supported the ALJ's RFC assessment. See 951 F.2d at

431. The court stated that:

Although we think it a close question, we find, on the
specific facts of this case, that there is substantial
evidence to support the Secretary's finding. Dr.
Sanchez' report-if not Dr. Arzola's-contains more in the
way of subsidiary medical findings to support his

---

[9] In fact, the ALJ's RFC is more restrictive in that the ALJ
"requir[ed] isolation from others with only up to occasional
supervision." (R. at 11)

12

conclusions concerning residual functional capacity than
is customarily found in the reports of consulting, non-
examining physicians.  Such reports often contain little
more than brief conclusory statements or the mere
checking of boxes denoting levels of residual functional
capacity, and accordingly are entitled to relatively
little weight.

Id.  Here, based on the foregoing, it is clear that Dr. Coyle did
not simply make conclusory statements or check boxes.

     As for Plaintiff's treating sources, his therapist, Susan
Benson, submitted a report dated October 8, 2008, the substance of
which reads in its entirety:

> HISTORY OF PRESENT ILLNESS:
> I have been meeting with [Plaintiff] almost on a weekly
> basis since 12/19/05.  He has significant symptoms of
> depression and PTSD brought about by a chaotic and
> abusive childhood. [Plaintiff] is also concerned because
> he appears to have significant memory loss, and he has
> difficulty completing tasks.  He has had to go back
> several times to make sure something has been done
> correctly.
>
> If you have any questions, please give me a call.  ...

(R. at 293)  Regarding this report, the ALJ stated that Ms. Benson
"did not specify the severity of these mental limitations."  (R. at
13)  There are no treatment notes from Ms. Benson in the record.
Cynthia Yang, M.D., Plaintiff's most recent treating psychiatrist,
declined to complete questionnaires, stating that "I have just
begun seeing [Plaintiff] and feel unprepared to comment adequately.
It will take me at least several visits to understand this patient
fully enough to comment in this regard."  (R. at 429)  Plaintiff's
counsel was unable to obtain an opinion from Plaintiff's prior

treating psychiatrist, Brian Daly, M.D. (R. at 190) Thus, there are no functional assessments from Plaintiff's treating sources in the record.

Plaintiff cites Alcantara v. Astrue, 257 Fed. Appx. 333 (1st Cir. 2007), in support of his argument that because the state agency sources had not reviewed the entire record their opinions should not be considered substantial evidence in support of the ALJ's RFC findings. Plaintiff's Mem. at 9. Alcantara, however, is distinguishable.

First, the First Circuit in Alcantara stated that the ALJ could not give significant weight to the nonexamining consultant's opinion because it was "based on a significantly incomplete record, and it was not well justified." Alcantara, 257 Fed. Appx. at 334. The court noted that the reviewing consultant had considered "no more than the first third of the record ...." Id. In the instant matter, Plaintiff alleges that the DDS reviewing sources had not reviewed "approximately 15 months of records." Plaintiff's Mem. at 9. Moreover, the Alcantara court observed that "[a]lthough the ALJ stated that the record underwent no material change, he did not explain his analysis. The record repeatedly indicated that the appellant deteriorated with her parents' deaths." Alcantara, 257 Fed. Appx. at 334. In fact, the court suggested that the ALJ was "unaware of the mother's death and the issue it raised." Id. Here, by contrast, Dr. Coyle's opinion was well justified, and the

ALJ was clearly aware of subsequent events. (R. at 13)(noting that the "more disabling GAF's of '20' to '50'" indicated by Plaintiff's treating and examining sources "only represent[ed] temporary exacerbations in symptoms which improved in short periods of time"); see also Discussion, Section I infra at 23-24.

Second, in Alcantara the First Circuit observed that:

The ALJ ignored Therapist Serabian's opinion because she was a licensed social worker, not an acceptable medical source. The ALJ could not simply ignore Serabian's opinion. Although *acceptable medical sources* are the primary sources of evidence about the severity of impairment and its effect on work abilities, they are not the sole permissible sources of such evidence. Serabian was a *medical source* capable of providing evidence about the severity and effects of impairment, as well as a general source of evidence. The ALJ was required to weigh all of the evidence.

Alcantara, 257 Fed. Appx. 334-35 (internal citations omitted). Unlike the ALJ in Alcantara, the ALJ here addressed the brief report of Plaintiff's treating therapist, Susan Benson. (R. at 13)("Although she noted that the claimant had 'significant' memory loss and 'difficulty' completing tasks, this treating therapist did not specify the severity of these mental limitations.")(internal citation omitted).

Third, the Alcantara court stated that "[t]he ALJ also discounted the appellant's limitations because she neglected prescribed treatment." Alcantara, 257 Fed. Appx. at 335. Specifically, the plaintiff had missed therapy appointments, but had obtained interim treatment during that time. The court

15

reasoned that "the rationale for requiring compliance with medical advice is not to punish minor lapses, but to ensure that claimants do what they can to restore capacity." Id. In the instant matter, there is a pattern of lack of motivation and failure to follow recommendations.

For example, in a July 5, 2009, summary of treatment, Natalie Lester, M.D., observed that Plaintiff's depression had been characterized by, among other things, "amotivation ...." (R. at 411) Plaintiff had previously rejected inpatient hospitalization. (R. at 351) Dr. Lester observed that Plaintiff "remains focused on medication management to help him feel better, but making changes in his life (e.g. regarding marriage and job) may result in more improvement than medications can provide." (R. at 411)

Dr. Daly, who thereafter took over Plaintiff's care, indicated on July 27, 2009, after Plaintiff's second visit, that Plaintiff's "amotivation is concerning and bodes poorly for success in [cognitive behavioral therapy] as [Plaintiff] would likely not do [homework,] etc." (R. at 412) Dr. Daly mentioned Plaintiff's lack of motivation on subsequent occasions. (R. at 413)("I am beginning to feel that [Plaintiff] has little motivation to get better"); (R. at 416);(noting that Plaintiff "puts little effort into his care & getting better"). Dr. Daly also described Plaintiff as "help rejecting." (R. at 420, 421, 423, 424) Dr. Daly noted that Plaintiff "tended to be reluctant to try psychotherapy," (R. at

413), initially stating that he thought his former therapist would not want to work with him since he lost his insurance, (R. at 412), and subsequently declaring that he had tried therapy in the past and "it didn't help," (R. at 417). In addition, Plaintiff "wouldn't do [Partial Hospitalization Program], would not do research study, does not want medication [change]," (R. at 418), all suggested by Dr. Daly. On November 12, 2009, Dr. Daly recorded that Plaintiff "became angry when the conversation turned to his possibly working[,]" (R. at 417), despite Dr. Daly's explanation that most research revealed that "work & structure helped with depression," (id.); see also (R. at 418)(noting that Plaintiff "has low tolerance for being challenged around working (disability)"); (R. at 419)(noting that Plaintiff was not amenable "to suggestions that working might be beneficial to him"). Dr. Daly concluded that "[f]rom all I can see though, including his past doing well while working [during the time he was drinking] & his current stagnation, disability is probably detrimental to him & he would likely do better working." (Id.); see also (R. at 423) (noting that Plaintiff was "resistant to suggestions of activity & work/volunteering"). Dr. Daly summarized his year with Plaintiff, in part, as "significant for help rejecting as noted by Dr. Lester (previous provider) & amotivation to do anything to move his life forward ...." (R. at 427) It was noted on June 30, 2010, by Rhode Island Hospital staff that Plaintiff was "awaiting disability which

17

may be affecting [his] desire to improve ...." (R. at 397)  Dr.
Yang, who assumed Plaintiff's care in July, 2010, recorded that
"[a]s per previous providers, [Plaintiff] appears quite help
rejecting ...." (R. at 425); see also (R. at 428).  Plaintiff
reiterated that he "wouldn't want to go [to therapy] anyway[,]" (R.
at 426), even if he had insurance.  It is noteworthy that after Dr.
Yang discontinued Plaintiff's Adderall, (R. at 425-26), he
continued to take it, (R. at 428).

     As the First Circuit has stated, "[i]mplicit in a finding of
disability is a determination that existing treatment alternatives
would not restore a claimant's ability to work."  Irlanda Ortiz v.
Sec'y of Health & Human Servs., 955 F.2d 765, 770 (1st Cir. 1991)
(alteration in original)(quoting Tsarelka v. Sec'y of Health &
Human Servs., 842 F.2d 529, 534 (1st Cir. 1988)).  Plaintiff's
refusal to consider treatment alternatives and, with regard to his
continuing to take Adderall, outright disregard for his treating
psychiatrist's order, goes well beyond the "minor lapses,"
Alcantara, 257 Fed. Appx. at 335, noted by the court in Alcantara.

     Plaintiff also argues that the diagnosis of Plaintiff's
"personality disorder, with symptoms of 'narcissism, provocative
statements, easily angered, poor inter personal relationships' was
made after the state agency psychologists made their review of the
record," Plaintiff's Mem. at 9 (quoting (R. at 422)), and that the
ALJ "determined on his own that [Plaintiff]'s personality disorder

did not constitute a severe impairment and caused no significant functional limitations," id. The first diagnosis of "pers[onality] d/o NOS," (R. at 424), appears in the record on May 10, 2010, (id.), although Dr. Daly had questioned whether there was an "Axis II component confounding his mood d/o ...," (R. at 409), from the beginning of his treatment of Plaintiff, (R. at 409-24, 427). The problem with Plaintiff's argument is that he has identified no functional limitations resulting therefrom. See Musto v. Halter, 135 F.Supp.2d 220, 233 (D. Mass. 2001)("Although the record is indeed peppered with references to [plaintiff]'s depression, there is absolutely no indication that it rises to the level of interfering with his inability to engage in any substantial gainful activity.")(internal quotation marks omitted). A diagnosis of a personality disorder, without more, does not equate to disability. See Torres v. Barnhart, 249 F.Supp.2d 83, 97 (D. Mass. 2003) ("[J]ust because [plaintiff] suffers from depression and anxiety simply does not mean, a fortiori, that she has any impairment or combination of impairments which significantly limits [her] physical or mental ability to do basic work activities.")(second alteration in original)(internal quotation marks omitted).

Plaintiff was questioned at the hearing regarding interpersonal relationships and anger issues:

Q    Do you have any difficulty dealing with people?

A    I don't know.

```
Q    Do you spend time with anyone besides your wife?

A    No.

Q    Why?

A    I just don't have the energy, the enthusiasm, just
     don't.

Q    Okay.

A    I just pretty much want to be by myself or with my
     four-legged, furry daughter in bed.

Q    At one point, your doctor mentioned you would get
     angry easily and poor interpersonal relationships.
     Would you say that that's true?

A    Yes.

Q    What, what will make you angry?

A    You'd have to ask my wife.  I -- you know --
     Somebody was to make fun of my four-legged, furry
     daughter, I'd -- I really don't pay attention to
     exactly what it is.

Q    What happens when you get angry?

A    Depends on whom I'm getting angry at.  If it's a --
     if it's a guy, I want to punch him.  If it's a
     girl, I might say something, but --
```

(R. at 28-39); see also (R. at 31)(noting that he would react to

stress in a fast-paced work environment by probably walking out or

getting angry).  To the extent Plaintiff's issues with anger and

interpersonal relationships can be considered functional

limitations resulting from Plaintiff's personality disorder, the

ALJ accounted for them in his RFC assessment.  He limited Plaintiff

to jobs without fast-paced production requirements.  (R. at 11)

The ALJ also restricted Plaintiff to jobs "requiring isolation from

others with only up to occasional supervision." (Id.)

Plaintiff makes a similar argument with regard to Plaintiff's June, 2010, suicide attempt, namely that the DDS psychologists did not see the records pertaining thereto. See Plaintiff's Mem. at 9 ("No medical source had reviewed those later records or gave an opinion of the functional limitations reflected therein."). Again, however, Plaintiff has failed to identify specific functional limitations allegedly reflected in these records.

Plaintiff was brought to Rhode Island Hospital by rescue on June 26, 2010, after taking a "couple swigs," (R. at 354, 386), of brake fluid and twelve clonezapam tablets, (id.), in what Dr. Yang described as a "suicidal gesture," (R. at 426).[10] Plaintiff initially was assigned a GAF of 20, (R. at 386, 389), was subsequently hospitalized, (R. at 353-55, 425), and "[i]nsight oriented and supportive therapy [was] provided, with appropriate patient response," (R. at 355). On discharge, his GAF was listed as 50, (id.), and the Rhode Island Hospital Discharge Summary stated:

> The patient denied suicidal or homicidal ideation and
> expressed hopefulness about the future. He is future-
> focused and goal-oriented. He denied auditory or visual
> hallucinations. His judgment and insight are both
> considered to be fair. Patient stated that he will call
> inpatient facility (S[S]TAR) and request admission in the
> event that he feels down again or has thoughts of
> suicide. P[atien]t is stable, future-oriented, and there

---

[10] Plaintiff twice had attempted suicide "years ago in the context of alcohol intoxication via [overdose] and cutting." (R. at 354)

is no evidence that he will try to hurt himself or
others.

(R. at 355)

Dr. Yang saw Plaintiff on July 7, 2010, six days after his
discharge.  (R. at 425)  Plaintiff related that prior to his
overdose "he had missed taking his medication (Effexor) for several
days [because] he had not received them in the mail."  (Id.)
According to Plaintiff, he felt that his symptoms worsened without
taking Effexor, "resulting in suicidal gesture ...."  (R. at 425-
26)  According to Plaintiff, "[s]ince admission, [he] feels his
mood, although depressed, is somewhat improved from restarting
Effexor."  (R. at 426)  Plaintiff endorsed passive suicidal
ideation, but did not have a plan, and reported that he was able to
contract for safety at home.  (R. at 425)  On his next visit, Dr.
Yang noted that Plaintiff appeared stable, presented no acute
safety issues at that time, had no suicidal or homicidal ideation,
and was future oriented.  (R. at 428)  Plaintiff described his mood
as "alright."

The Court finds that the ALJ could reasonably have concluded
that Plaintiff's suicide attempt/gesture represented a temporary
exacerbation of symptoms which resolved in a short period of time,
(R. at 13); see also Irlanda Ortiz, 955 F.2d at 769 (noting that a
court must uphold the Commissioner's findings "if a reasonable
mind, reviewing the evidence in the record as a whole, could accept
it as adequate to support his conclusion"), especially given

22

Plaintiff's description of having been off his anti-depressant medication for several days prior to overdosing, (R. at 425-26). Further, Dr. Yang's expressed belief that, in general, she did not believe in disability for psychiatric reasons because "[f]or most psychiatric illnesses the majority of data shows that structure and returning to work as soon as possible are beneficial, and that lack of structure is deleterious to a patient's mental health and recovery," (R. at 429), is consistent with Dr. Daly's advice to Plaintiff, (R. at 417).

Finally, Plaintiff's contention that the ALJ "determined on his own that the GAF ratings above 50 were reliable reflections of [Plaintiff]'s functioning while the ratings below 50 were not," Plaintiff's Mem. at 9, and that "[h]e was not qualified to do any of that[,]" is unpersuasive. Plaintiff was assessed GAF ratings of 58 or above[11] on ten separate occasions. (R. at 321-28, 334, 343) He was assigned a GAF of 20[12] on arrival at the Rhode Island Hospital emergency room after his suicide attempt, (R. at 386, 389), a GAF of 25[13] during his stay, (R. at 388, 397), and a GAF of

---

[11] See n.4.

[12] See n.5.

[13] A GAF between 21-30 is described as follows: "**Behavior is considerably influenced by delusions or hallucinations OR serious impairment in communication or judgment** (e.g., sometimes incoherent, acts grossly inappropriately, suicidal preoccupation) **OR inability to function in almost all areas** (e.g., stays in bed all day, no job, home, or friends)." DSM-IV-TR at 34.

50[14] on discharge, (R. at 355, 400)  Dr. Fontaine also assessed a GAF of 50.[15]  (R. at 299)

While the Court would be concerned if the ALJ had extrapolated specific functional limitations from a certain GAF score, it was reasonable for the ALJ to conclude, simply based on the numbers, that the GAFs of 20, 25, and 50 "only represent[ed] temporary exacerbations in symptoms which improved in short periods of time." (R. at 13); see also Irlanda Ortiz, 955 F.2d at 769; Gordils, 921 F.2d at 329 (noting that ALJ is not precluded from making common-sense judgments).  Moreover, the sources assessing these GAF scores were not long term treating sources, and Dr. Fontaine examined Plaintiff only once.

Although a close question, the Court finds that, in the circumstances of this case, the ALJ was justified in relying on the assessments of the DDS reviewing sources.  Accordingly, Plaintiff's first claim of error is rejected.

## II.  The ALJ's credibility finding

The ALJ found that, although Plaintiff's medically determinable impairments could reasonably be expected to cause the symptoms alleged, his statements concerning the intensity, persistence, and limiting effects of those symptoms were

---

[14] See n.5.

[15] Dr. Fontaine also stated, however, that "[w]ith cognitive behavioral therapy, as well as medication, [Plaintiff's] prognosis should improve."  (R. at 299)

inconsistent with the ALJ's RFC determination. (R. at 12) Plaintiff contends that the ALJ's credibility findings are not supported by substantial evidence. Plaintiff's Mem. at 10.

An ALJ is required to investigate "all avenues presented that relate to subjective complaints ...." Avery, 797 F.2d at 28.[16] In addition, "whenever the individual's statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the adjudicator must make a finding on the credibility of the individual's statements based on a consideration of the entire case record." SSR 96-7p, 1996 WL 374186, at *2 (S.S.A.).

It is not sufficient for the adjudicator to make a single, conclusory statement that "the individual's

---

[16] Specifically, the ALJ is directed to consider, in addition to the objective medical evidence, the following factors:

1. The individual's daily activities;
2. The location, duration, frequency, and intensity of the individual's pain or other symptoms;
3. Factors that precipitate and aggravate the symptoms;
4. The type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;
5. Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;
6. Any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and
7. Any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

Avery, 797 F.2d at 29; see also 20 C.F.R. § 404.1529(c)(3) (2011) (listing factors relevant to symptoms, such as pain, to be considered); SSR 96-7p, 1996 WL 374186, at *3 (S.S.A.) (same).

allegations have been considered" or that "the
allegations are (or are not) credible." It is also not
enough for the adjudicator simply to recite the factors
that are described in the regulations for evaluating
symptoms. The determination or decision must contain
specific reasons for the finding on credibility,
supported by the evidence in the case record, and must be
sufficiently specific to make clear to the individual and
to any subsequent reviewers the weight the adjudicator
gave to the individual's statements and the reasons for
that weight.

Id. The ALJ's credibility finding is generally entitled to
deference, especially when supported by specific findings. See
Frustaglia v. Sec'y of Health & Human Servs., 829 F.2d 192, 195 (1st
Cir. 1987)(citing DaRosa v. Sec'y of Health & Human Servs., 803
F.2d 24, 26 (1st Cir. 1986)).

Here, the ALJ summarized Plaintiff's hearing testimony as
follows:

At the hearing, the claimant testified that he has been
experiencing recurrent depression characterized by angry
outbursts and being in a "dark place" where suicide is
contemplated at least a "couple times a month." The
claimant asserts being sober from alcohol for at least 4
years though his depressive and attentional symptoms have
worsened since then. The claimant is taking multiple
psychiatric medications including Effexor. This
medication causes tiredness as a side-effect. As to
functional limitations, the claimant stated that he has
focus/concentration problems and difficulty getting along
with other people. He does continue to drive. In
describing his daily activities, the claimant noted that
he lives in a "RV" in his mother-in-law['']s driveway. He
does not shower regularly and doesn't get dressed
occasionally. Although his wife does most of the
household chores, the claimant admits to sweeping floors
and taking out the trash. He does enjoy "tinkering" with
old scrap computers. The claimant takes 2 long (2-3
hours each) naps during the day. He does not associate
with anyone other than his wife. The claimant does go
out to the park with his dog once or twice a month.

(R. at 11-12)  It is clear from the preceding passage that the ALJ contemplated the required factors.  See Avery 797 F.2d at 29.  He did not make a single, conclusory statement regarding consideration of Plaintiff's allegations or their credibility, nor did the ALJ simply recite the factors.  The ALJ noted Plaintiff's statements regarding his activities of daily living; the frequency and intensity of his depressive symptoms; the fact that he takes multiple psychotropic medications, including Effexor, and that tiredness is a side effect thereof; his functional limitations; and his lack of social activities.

In addition, at the hearing Plaintiff was asked about his recent suicide attempt and whether anything precipitated his suicidality:

> Q    When was the last time before that you felt suicidal?
>
> A    Apparently two weeks prior.
>
> Q    Does that just come over you or does something trigger it?
>
> A    Yes. No, sort of just -- My doctors asked you, you don't -- Can you remember what particularly happened?  Anything happened, when an episode happen -- No.

(R. at 32)  Accordingly, the Court finds that the ALJ considered the requisite criteria in evaluating Plaintiff's credibility.  See Avery, 797 F.2d at 29; 20 C.F.R. § 404.1529(c)(3); SSR 96-7p, 1996 WL 374186, at *3.

Plaintiff's main contention appears to be that the only specific reason the ALJ gave for disbelieving Plaintiff "was his having applied for unemployment compensation, which, according to the ALJ[,] 'indicated that he was "ready, able and willing to work" [and] is clearly inconsistent with these disabling allegations.'" Plaintiff's Mem. at 10-11 (quoting (R. at 13))(second alteration in original). According to Plaintiff, "[t]here was no evidence before the ALJ that [Plaintiff] alleged he was able to work full time when he applied for unemployment, or that he believed he could hold a job for any significant length of time." Id. at 11.

Regarding this issue, the ALJ questioned Plaintiff as follows:

Q    Looked like you collected a little bit of unemployment last year too?

A    Yes.

Q    Is that still going on?

A    No.  That stopped --

Q    Okay.

A    -- awhile ago.

Q    You do recognize when you collect unemployment, you [are] certifying you're ready, willing and able to work?

A    I told that to my -- several of my doctors and they said, Well you really had no choice, you know.  I had no income and they --

Q    Okay. ...

(R. at 24-25)  The ALJ determined that "[i]n terms of his alleged severe symptoms and disabling limitations, the claimant's receipt

of 'unemployment compensation' during the alleged period of disability which indicated that he was 'ready, able and willing to work' is clearly inconsistent with these disabling allegations." (R. at 13)(internal citation omitted). The Court finds that the ALJ could reasonably have reached this conclusion. See Irlanda Ortiz, 955 F.2d at 769; see also Barrett v. Shalala, 38 F.3d 1019, 1024 (8th Cir. 1994)(noting that "in order to be eligible for unemployment benefits, [the plaintiff] was required to sign documents stating that he was capable of working and seeking work" and finding that "[t]his statement is clearly inconsistent with [his] claim of disability during the same period").

Plaintiff did not just *apply* for unemployment benefits, see Plaintiff's Mem. at 10, 11, by his own admission he *collected* benefits, (R. at 25). In order to do so, he certified that he was ready, willing, and able to work. (Id.) Thus, contrary to Plaintiff's assertion, see Plaintiff's Mem. at 11, there was evidence before the ALJ, in the form of Plaintiff's testimony, from which the ALJ could reasonably have concluded that Plaintiff's statements were inconsistent. Nor is it relevant what Plaintiff believed regarding his ability to work. See id. What *is* relevant is whether the ALJ had a reasonable basis for his credibility finding and whether he articulated that reason. The Court answers these questions in the affirmative.

In addition, the ALJ noted, albeit in a different context,

that Plaintiff's "own psychiatric clinicians at the Rhode Island Hospital Department of Psychiatry have predominantly noted GAF's between '58' and '65' consistent with only mild to moderate symptoms."[17]  (R. at 13)(internal citations omitted).  While GAF scores are not determinative, see 65 FR 50746, 50764-65 (declining to endorse the use of the GAF scale in Social Security disability programs and stating that "[i]t does not have a direct correlation to the severity requirements in our mental disorders listings"), they are certainly something which an ALJ may consider in making a credibility finding, see Chanbunmy v. Astrue, 560 F.Supp.2d 371, 383 (E.D. Pa. 2008)(noting that GAF score "is intended to rate a patient's current general overall functioning, which is useful in tracking a patient's progress in global terms"); id. at 385 ("Courts have ... affirmed ALJs' decisions of nondisability in cases wherein claimants have GAFs in the range of 51-60.").

The Court concludes that the ALJ evaluated Plaintiff's credibility in accordance with the requirements and that the ALJ adequately stated his rationale for his credibility finding. Therefore, the Court also rejects Plaintiff's second claim of error.

## Summary

The Court finds that the ALJ's mental RFC findings are supported by substantial evidence in the record.  The Court further

---

[17] See n.4.

finds that the ALJ's credibility evaluation is supported by substantial evidence.

## Conclusion

The Court concludes that the ALJ's determination that Plaintiff is not disabled within the meaning of the Act is supported by substantial evidence in the record. Accordingly, I order that Defendant's Motion to Affirm be granted. I also order that Plaintiff's Motion to Remand be denied.


/s/ David L. Martin
DAVID L. MARTIN
United States Magistrate Judge
June 4, 2012